# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 5681 | **DATE** | 1/2/2003 |
| **CASE TITLE** | United States ex rel. Clifton McFowler vs. Mark A. Pierson | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g. plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Petitioner's petition for a writ of habeas corpus is granted. Respondent is ordered to release petitioner from custody within 20 days of the entry of this order.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

courtroom deputy's initials

MM

number of notices

JAN 08 2003
date docketed

docketing deputy initials

date mailed notice

CLERK U.S. DISTRICT COURT

03 JAN -8 AM 7: 27

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel CLIFTON McFOWLER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 96 C 5681 |
| | ) | |
| v. | ) | |
| | ) | |
| MARK A. PIERSON, | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Following a bench trial in the Circuit Court of Cook County, petitioner Clifton McFowler

was convicted of first-degree murder and sentenced to forty years in prison. After an unsuccessful

appeal and denial of leave to appeal by the Illinois Supreme Court, McFowler petitioned this court

for a writ of habeas corpus. For the reasons set forth below, the petition is granted.

## I. Background

### A. The Evidence

Trial commenced on March 19, 1992. The state's first witness was Charlene Meredith,[1] who

testified as follows. On October 9, 1989 she lived in the second floor apartment at 3144 West

Lexington with her sister, Glenda Roberts, their respective boyfriends, Sammy Logan and Percell

Swiney, and children. Just before noon, Logan left her in her bedroom to answer a knock on the

front door. Through the closed door, Meredith heard a shot. When her son Davion, aged two,

opened the door, she saw at a distance of approximately 16 feet a black man with a shotgun. The

man appeared to be short because he tripped and fell over Logan, who was lying on the floor of the

---

[1]The state had previously called Trenton Byndum, but he refused to testify and was
sentenced to six months for contempt.

kitchen. (It was later stipulated that an examination of Logan's deceased body revealed that he had bullet entry wound on the left forehead.) Meredith heard a voice in the back say "if you are going to shoot him[,] shoot him." (R. G-22.) When Davion opened the door Meredith grabbed him by his shirt, pulled him in the room, and got in the closet. She remained in the closet about 15 to 20 minutes. Around 5:30 p.m. the same day, Meredith viewed a six-person lineup at a Chicago police station. She told the police officers that the second person from the end looked like the one who was in her house. When shown a photograph of the lineup on the stand, Meredith circled McFowler and pointed him out in court as the man she saw with the shotgun. She also identified one of the state's exhibits (more on that later) as the shotgun she saw.

On cross-examination, Meredith explained that although the man with the shotgun was not facing her initially, she did get a clear look at his face when he fell. The man was wearing blue jeans with a white T-shirt. Meredith could not recall in which hand the man was carrying the shotgun. Meredith testified that she had never seen McFowler prior to the October 9 incident. Meredith admitted that the person she circled in the photograph of the lineup was not the second person from either end. When asked whether she picked out a different man in actual the lineup, a man wearing striped pants and a sleeveless blue T-shirt, she responded that she "picked out both." (R. G-35.) She admitted that neither of the two people she claimed to have identified at the lineup was the second one from the end. She remembered talking to a Detective Foley on the day of the incident, but did not remember telling Foley that she had seen the man with the shotgun before in the neighborhood. On redirect, the state brought Trenton Byndum into the courtroom and asked Meredith which of these two men she saw trip over Logan. She reaffirmed her identification of McFowler. On recross,

2

Meredith estimated that she saw the face of the man in her apartment for "[m]aybe just a few minutes" (R. G-40), and that she had not seen McFowler again since the date of the incident.

It was later stipulated that if called Detective Foley would testify that he had an interview with Meredith after the incident and she related to him that she had seen the black man with the shotgun before in the neighborhood. Foley would further testify that he conducted a lineup at approximately 5:30 p.m. on October 9, that Meredith viewed the lineup in which Byndum and McFowler were participants, and that she identified Byndum as the man she saw in her apartment with the shotgun in his hand.

The state's next witness was Officer Delpilar. First, Delpilar related the events which led him to the scene of the crime around noon on October 9, 1989. Upon arriving, he observed Percell Swiney sitting on the front steps to the apartment with a gunshot wound in the right arm. After speaking to civilians at the scene, Delpilar broadcast a description of three suspects: (1) a male black, late teens, early twenties, approximately six foot, 180 pounds, with brown eyes and black hair, wearing a red and white jogging suit, with gym shoes; (2) a male black in his twenties, wearing an orange shirt with red jogging pants; and (3) a female black approximately 18 to 20 years of age, wearing white pants with high black riding boots. Delpilar located a set of automobile keys on the third or fourth stair from the top of the internal stairwell leading up to the second floor of the rear house. Those keys, he testified, fit both the driver's side door and the ignition of a gray four-door Ford Escort located in front of the house. On cross-examination, Delpilar admitted that although he considered the keys to be evidence he did not preserve them for fingerprints.

Officer Kulbida testified that he learned from unidentified bystanders that a blue vehicle was used as a getaway car. On cross-examination, Kulbida clarified that he meant the same car that had

3

previously been described as gray, that it appeared to be light blue at the time, and that, in his opinion, the color depicted in the photograph exhibit of the car could be light blue.[2] Based on statements from witnesses, Kulbida toured the area a bit north of the crime scene and, in approximately two or three minutes, spotted a woman fitting the description of the third suspect. After the woman spoke to Kulbida, he went to the second floor apartment at 3258 West Flournoy (approximately two blocks from the crime scene), where he found, in addition to a woman and a couple of small children, Byndum and McFowler. This happened approximately 30 minutes after the crime was first reported. McFowler was in the bedroom wearing blue jeans with no shirt, shoes, or socks. Detective Gulliford later testified that McFowler was laying in the bed at first. Byndum was in the living room area wearing blue or light blue striped jeans, a blue top with no sleeves, white socks, and no shoes. According to Gulliford, there was blood on the right sock. Laying on the floor next to Byndum were a trench coat, a pair of Nike shoes, and a "Payless" bag containing various items of clothing. Among the clothing, a pair of red and white jogging pants, one of the shirts, and a jogging jacket had what appeared to be blood stains.

Detective Baiocchi testified that, after Byndum and McFowler were arrested, he recovered a right Converse gym shoe from the oven of the apartment where the two men were found. Baiocchi sent the shoe to the crime lab for analysis because it had spots which he perceived could have been blood. Baiocchi recovered a similar left shoe from the passenger side of the four-door gray car he saw earlier near the crime scene—the car was unlocked, he explained. That shoe was also sent to the lab. Testing revealed that human blood was present on both shoes, although in sufficient quantity

---

[2]The copy of the record provided to this court includes only a black-and-white photocopy of this exhibit.

4

to obtain a blood type only on the left shoe. That blood, like a vial recovered from the crime scene, was Type B.[3] McFowler tried on the Converse shoes at trial, which appeared to fit. They also appeared to fit his lawyer. Baiocchi testified that he observed a bloody footprint at the first floor landing of the rear building at 3144 West Lexington. It was later stipulated that an expert in shoe print comparison would testify that the photograph of the bloody footprint was of the same type, size, and style of shoe as the Nike gym shoes, but that he could not say with a reasonable degree of scientific certainty that the Nike shoes in fact made the footprint. Baiocchi also related several statements that McFowler had made to him on the day of his arrest: that McFowler had gone over to the Flournoy address with a friend the night before and had remained there until the police arrived, that Byndum was his cousin, that McFowler called Byndum earlier in the day and told him where he was going to be, but, later in the interview, that the conversation with Byndum took place the day before. Baiocchi testified that he did not observe a telephone in the Flournoy apartment.

Robert Berk, a Trace Evidence Analyst in the Chicago police department crime lab, testified that he performed gunshot residue examinations on samples taken from Byndum's and McFowler's hands on October 9. The positive results for Byndum indicated that he had been in the environment of gunshot residue, which was consistent with having handled recently fired weapons. Because a control swap had an elevated level of barium, the results for McFowler were inconclusive, but the swabs from his hands did have elevated levels of barium, lead, and antimony, all three of the heavy metals normally tested. Several additional pieces of evidence came in by stipulation. Seven

---

[3]Although no evidence concerning the frequency of this blood type was presented at trial, the court takes judicial notice of the fact that approximately 20% of blacks in the United States have Type B blood. *Racial & Ethnic Distribution of ABO Blood Types*, http://www.bloodbook.com/world-abo.html (last modified Aug. 21, 2002).

fingerprints were lifted from the Escort: the three lifted from the front driver's side door matched

those of McFowler; the one print from the passenger door matched one of Byndum's. The expert

would testify that he could not say with any degree of scientific certainty how long those prints had

been present on the car. A .38 revolver with four spent casings and two live rounds and a .20-gauge

shotgun with two live rounds were found in the rear stairwell of the basement at 3258 West Flournoy

hidden in a secreted place by bricks.

    The trial court found McFowler guilty of first degree murder and sentenced him to 40 years

imprisonment.

B. The Illinois Appellate Court Decision

    In affirming McFowler's conviction, the Illinois Appellate Court reasoned as follows:

> A review of the evidence in this case confirms that it was sufficient to support
> the finding of a rational trier of fact that the defendant was guilty beyond a reasonable
> doubt. Meredith testified that she identified the defendant in a lineup only six hours
> after the shooting occurred. Her testimony would support the conclusion that she had
> sufficient opportunity to observe the defendant at the time of the offense. She
> testified that she viewed his face from distance of approximately sixteen feet as he
> tripped over the victim, although we greet with some skepticism her further
> testimony that she was able to maintain her view of him for perhaps as long as a few
> minutes.
> We recognize both that Meredith exhibited confusion at trial regarding the
> defendant's position in the lineup and that the parties had stipulated that Detective
> Foley would testify that she identified Byndom from the lineup as the person holding
> the shotgun. However, any such confusion or apparently conflicting evidence would
> not necessarily mandate that the circuit court totally disregard her lineup
> identification. Meredith testified on cross-examination that she identified *both* the
> defendant and Byndom at the October 9, 1989 lineup. The trial judge indicated that
> Foley's stipulated testimony would tend to impeach Meredith's testimony that she
> identified the defendant in the lineup. Thus, it is unclear whether the trial judge was
> denoting that he was discrediting totally her purported lineup identification or simply
> decreasing the weight to be assigned to it. *See People v. Sanchez*, 503 N.E.2d 277,
> 284 (Ill. 1986) (stating that the resolution of inconsistencies in testimony is wholly
> the responsibility of the trier of fact).

Even if Meredith's lineup identification were given no weight whatsoever, there still would have been credible eyewitness testimony in this case. Meredith made an unwavering in-court identification of the defendant. The strength of this identification was only reinforced when Meredith, during redirect examination, viewed both the defendant and Trenton Byndom together in court and reaffirmed that the defendant was in fact the person she saw trip over the victim on October 9, 1989.

. . .

This case is distinguishable from [*People v. Byas*, 453 N.E.2d 1141 (Ill. App. Ct. 1983)]. In *Byas*, the victim herself apparently acknowledged her uncertainty in her prior out of court attempts to identify the defendant as well as in her attempt at the preliminary hearing. Moreover, at the preliminary hearing in *Byas* the State conceded that "it's clear here that there is an issue as to whether [the victim] can identify [the defendant]." *Id.* at 1145. Here, Meredith never acknowledged any uncertainty in making an out of court identification of the defendant. Moreover, there is no indication that Meredith showed any uncertainty in any prior court proceeding nor has any concession to that effect been made by the State. In addition, although we find no record of any prior physical description of the assailant provided to the police by Meredith, we note that her description of the assailant at trial as a short African American man was not challenged.[4] Even more important, unlike *Byas*, substantial evidence, discussed immediately below, specifically corroborating the defendant's identity as one of the assailants, was presented at trial. Given the foregoing, we find *Byas* unavailing to the defendant's argument.

In addition to Meredith's identifications, the State also introduced substantial corroborative testimonial and physical evidence. Meredith identified in court the shotgun which, along with a .38 caliber revolver, were recovered from within the nearby building at 3258 W. Flournoy, which contained the apartment in which the defendant and Byndom were arrested. Officer Delpilar recovered keys from a stairway within the rear house at 3144 W. Lexington which fit a Ford Escort which was parked directly across the street. Officer Gulliford received information that two persons went to that Ford Escort after having fled from the scene of the crime, apparently just before the officers arrived. The testimony of Officers Delpilar and Gulliford strongly linked the Ford Escort to this crime.

The defendant and Byndom were linked to that Ford Escort by reason of their fingerprints having been found on its exterior. Further linkage occurred when the police discovered inside that auto a left Converse gym shoe which was the apparent mate of a Converse gym shoe recovered from an oven within the apartment on Flournoy. Both of those shoes were stained with human blood, the blood on the left shoe being identified as type B, apparently the same type as the victim's. The

---

[4][Footnote in original.] We also note that Meredith's description of the assailant at trial corresponds with information contained in the defendant's presentence investigation report which describes him as an African American, five feet six inches tall.

defendant was required to try on those Converse gym shoes in court and they appeared to fit him.

Moreover, an additional pair of gym shoes, bearing the Nike brand, were found in the apartment on Flournoy showing what appeared to be blood stains. The pattern of the soles of those Nike shoes matched a bloody footprint found at the crime scene. Thus, the single Converse shoe found inside the oven, which apparently matched the Converse shoe found in the Ford Escort, and the Nikes found inside the apartment, corroborated the inference that Byndom and the defendant, who were both barefoot at the time of their arrest just thirty minutes after the shooting, were the individuals who wore those shoes at the crime scene.

*People v. McFowler*, No. 1-92-2176, at 32-38 (Ill. App. Ct. Sept. 29, 1995).

The Illinois Supreme Court denied McFowler's petition for leave to appeal. This habeas petition followed.

## II. Analysis

Among other things, McFowler claims that the evidence presented at trial was insufficient to support his conviction. The state concedes that McFowler fairly presented this claim to the Illinois courts and that no state law remedies remain available. Accordingly, no procedural bars stand between this court and the merits. The relevant legal question is: Was it objectively unreasonable for the Illinois Appellate Court to conclude that any rational trier of fact, after viewing the evidence in the light most favorable to the state, could have found the essential elements of first degree murder beyond a reasonable doubt? *Williams v. Taylor*, 529 U.S. 362, 409-10 (2000); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Although it is an exceedingly close question, this court is convinced that the answer is yes and that the habeas petition must therefore be granted.

The offense of first degree murder in Illinois is defined as follows:

> (a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

8

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder.

720 ILCS 5/9-1 (West 1993 & Supp. 2002).[5] Illinois statute additionally provides that "[a] person is legally accountable for the conduct of another when . . . [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 1993 & Supp. 2002).

It appears that the state at trial proceeded on an accountability theory. The state relied primarily on Meredith's identification of McFowler as the man carrying the shotgun. Since it takes two hands to fire a shotgun, the natural inference is that the revolver, which apparently fired the fatal shot, was not in McFowler's possession. To be liable as a principal for first degree murder, the defendant must "perform[] the acts which cause the death." 720 ILCS 5/9-1(a). The trial court did not specify whether it found McFowler guilty as a principal or as an accomplice. (R. K57 ("Sure looks to me like proof beyond a reasonable doubt, if not the actual murder then being an accomplice.").) The appellate court did not weigh in on this issue—indeed, it did not even list the elements of first degree murder. Mere presence at the scene of a crime, even when coupled with flight, cannot establish criminal accountability. *People v. Shaw*, 713 N.E.2d 1161, 1173 (Ill. 1998).

---

[5]Despite intervening amendments to other parts of the murder statute, this language has remained unchanged since before 1989. *People ex rel. Daley v. Strayhorn*, 521 N.E.2d 864, 871 (Ill. 1988).

But here there was slightly more than that. Accepting Meredith's testimony as true (more on that below), McFowler carried a shotgun and a voice from elsewhere in the apartment said "if you're going to shoot him, shoot him," possibly suggesting a degree of active participation by McFowler and some coordination between the intruders (assuming, without evidentiary support, that the voice was the voice of one of the intruders addressing the man with the shotgun), albeit after Logan had been shot. *See People v. Reid*, 554 N.E.2d 174, 191-92 (Ill. 1990) (explaining that events after the commission of a crime may support an inference of a prior common purpose or plan). Visibly carrying a weapon tends to deter resistance and thereby to facilitate an attack. *Cf. People v. Bolden*, 375 N.E.2d 898, 904 (Ill. App. Ct. 1978) (reasoning that defendants "lent aid and assistance to the group's activity by carrying weapons"). Whether a rational factfinder could find McFowler guilty beyond a reasonable doubt as an accomplice on such a theory strikes this court as a difficult question. For present purposes, the court will assume that, if McFowler was the man with the shotgun, the evidence was sufficient to support a finding of guilt on an accountability theory.

A. Meredith's Identification of McFowler Was Unreliable

The premise, however, is problematic. No rational trier of fact could ascribe any weight to Meredith's testimony concerning her identification of McFowler from the lineup on the day of the crime. When confronted with Foley's stipulated testimony that she had identified Byndum in the lineup, she explained that she had identified "both." The Illinois Appellate Court cited this explanation in support of the view that it was within the trial court's discretion to rely on the lineup identification. Not so. Meredith had already testified that she saw only one assailant, the man with the shotgun who tripped over Logan. McFowler and Byndum are not identical twins; by allowing a comparison at trial the court implicitly found that it was possible to distinguish between them. To

10

have identified them both at the lineup as the one person she saw at the scene would have been nonsensical. *Cf. United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990) (explaining that when a witness's story is "'so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it,' . . . the appellate court is not bound by the factfinder's decision to believe the story") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)). Meredith could not have seen both men if she saw only one. *See United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir. 1989) (explaining that a witness's testimony is incredible as a matter of law when it was "physically impossible for the witness to observe that which he or she claims occurred").

At best (from the state's perspective), Meredith's testimony indicates that she could not remember what happened at the lineup. This inference is bolstered by Meredith's earlier testimony that she identified the second person from the end, even though neither McFowler nor Byndum was in that position. Setting aside Meredith's wholly implausible account, the only competent evidence concerning the lineup was Foley's stipulated testimony that Meredith identified Byndum. It was also stipulated that Foley would testify that Meredith told him on the day of the crime that she had previously seen the man with the shotgun around the neighborhood. Meredith testified that she did not remember this conversation, but that she had never seen McFowler prior to October 9, 1989. The only rational conclusion is that Meredith in fact identified Byndum in the lineup. Her "both" explanation is nonsensical, and there is no other reason to doubt Foley's version of events. To be clear, this was not a genuine credibility contest between Meredith and Foley—Meredith's own account of what happened at the lineup simply made no sense. *Cf. Anderson*, 470 U.S. at 575.

The Illinois Appellate Court went on to find that "[e]ven if Meredith's lineup identification were given no weight whatsoever, there still would have been credible eyewitness identification

11

testimony in this case," citing her "unwavering" in-court identification of McFowler and selection of him over Byndum in a two-person display. (Op. at 34.) To disregard the lineup evidence entirely was clear legal error. In evaluating a claim of insufficiency, the evidence must be viewed "in its totality, not in isolation." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000); *cf. Evans-Smith v. Taylor*, 19 F.3d 899, 909 n.29 (4th Cir. 1995) ("Favoring the prosecution with all inferences does not mean that we must ignore evidence that is in the record, but which they ignore."). The credibility of Meredith's in-court identification of McFowler had to be evaluated in the context of her out-of-court identification of Byndum. That Meredith, within six hours of the crime, identified someone else in a non-suggestive lineup that included McFowler casts serious doubt upon her contradictory testimony almost two-and-a-half years later.

The traditional indicia of reliability strongly favor Meredith's identification of Byndum. In addition to the circumstances of the confrontation itself, the following factors are generally considered relevant in evaluating the reliability of an eyewitness identification:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The Illinois Appellate Court listed these factors, but did not apply them systematically to the two identifications. Doing so demonstrates that no rational trier of fact could prefer the in-court identification of McFowler.

First, the suggestiveness of a courtroom identification where a single defendant sits at counsel's table is obvious. That the trial is taking place sends a strong message to the witness that the state believes the defendant is guilty. *United States v. Archibald*, 734 F.2d 938, 941-42 (2d Cir.

12

1984); *see also United States v. Owens*, 484 U.S. 554, 562 (1988) (explaining that premise of the federal rule exempting statements of identification from the definition of hearsay "was that, given adequate safeguards against suggestiveness, out-of-court identifications were generally preferable to courtroom identifications"); *Moore v. Illinois*, 434 U.S. 220, 229 (1977) ("[A] one-on-one confrontation generally is thought to present greater risks of mistaken identification than a lineup."); *Stovall v. Denno*, 388 U.S. 293, 302 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."). It is true that after Meredith had already identified McFowler once under oath, she reaffirmed her identification when asked to choose between him and Byndum. Of course, every witness naturally feels pressure to be consistent, especially when giving sworn testimony. *Cf. United States v. Wade*, 388 U.S. 218, 229 (1967) (stating that "it is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on") (internal quotation marks and citation omitted). But even ignoring the pull of consistency, selecting a person from among two choices is less reliable than selecting from among six, which was the number of participants in the October 9 lineup.

The first and second *Biggers* factors, which relate to the circumstances of the crime, obviously cannot distinguish between two contradictory identifications by a single witness. There was no evidence of any pre-confrontation description of the assailant by Meredith, so the third factor likewise falls out of the equation.[6] The Illinois Appellate Court placed some emphasis on the

---

[6]The Illinois Appellate Court noted that Meredith's description of the assailant at trial as "a short African American man" was unchallenged and corresponded to information contained in the defendant's presentence report. (Op. at 36 & n.2.) Of course, her ability to describe McFowler (or to identify him in the photograph of the lineup) while he was sitting at counsel's table does not provide meaningful support for the reliability of her in-court identification. It is

"unwavering" nature of Meredith's in-court identification of McFowler. (Op. at 34.) It is true that Meredith identified McFowler more than once during the course of her testimony, but the trial judge expressed no such assessment and Meredith offered no testimony concerning her level of certainty. Because there was no evidence concerning the degree of confidence Meredith exhibited when she identified Byndum in the lineup, it strikes this court as essentially impossible to compare the relative level of Meredith's certitude in her two contradictory identifications, but perhaps the repetition at trial gives the in-court identification a very slight advantage on this score.

The final *Biggers* factor, the length of time between the crime and the confrontation, weighs strongly in favor of the lineup. Memories fade over time. *United States ex rel. Hudson v. Brierton*, 699 F.2d 917, 925 (7th Cir. 1983). Meredith identified Byndum at the lineup within six hours of the crime; more than twenty-nine months passed before she identified McFowler at trial. Common sense dictates that Meredith's memory of the assailant was better on the day of the crime than it was nearly two and a half years later. Given Meredith's same-day identification of Byndum, the suggestiveness of the in-court identification procedure, and the very long time delay between the two, it was objectively unreasonable for the Illinois Appellate Court to find credible Meredith's, albeit "unwavering," in-court identification of McFowler. *See Samuels v. Mann*, 13 F.3d 522, 527 (2d Cir. 1993) ("Contemporaneous identifications . . . generally are given much more credence [than in-court identifications].").

---

also worth noting that Meredith's assessment of the assailant's height was qualified: she testified only that "he looked short when I saw him because he fell." (R. G-20.) What remains of the description, African American man, is too general to be of any real value.

14

## B. The Other Evidence Could (Just Barely) Place McFowler at the Scene

Crediting instead Meredith's identification of Byndum, the case against McFowler consisted primarily of the following: Meredith heard someone other than the man with the shotgun say "if you're going to shoot him, shoot him"; the keys to a Ford Escort parked nearby were on the stairs leading to the apartment in which Logan was shot; McFowler's and Byndum's fingerprints were on the Escort; a Converse shoe with type B human blood on it was in the unlocked Escort; type B human blood was recovered at the crime scene; a matching Converse shoe, also with human blood although of unknown type, was found approximately two blocks away in an oven in the second floor apartment at 3258 West Flournoy, where both McFowler and Byndum were found approximately thirty minutes after the crime was reported; the Converse shoes appeared to fit McFowler at trial; McFowler and Byndum were the only adult men in the Flournoy apartment; neither man was wearing shoes; McFowler was wearing only blue jeans and was found in bed; next to Byndum in another room were found a pair of Nike shoes and a "Payless" bag containing clothing; a bloody footprint at the crime scene was of the same type, size, and style as the Nike gym shoes, but an expert could not say with a reasonable degree of scientific certainty that the Nike shoes in fact made the footprint; the Nike shoes appeared to the trial judge to be blood-stained; a revolver and a shotgun were recovered in the basement of 3258 West Flournoy; the shotgun was identified by Meredith at trial as the one she saw at the crime scene; Byndum's hands tested positive for gunshot residue; and McFowler's gunshot residue test was inconclusive.

As McFowler persuasively argues, no single piece of this evidence goes very far toward connecting him to the crime scene. It was stipulated that there was no way to determine how long the fingerprints had been present on the Escort. And because cars move, it is impossible to say with

any degree of certainty based on the fingerprints alone that McFowler was ever in the location where the car was found, let alone on the day of the murder. It is also worth noting that the police found other fingerprints on the Escort which apparently could not be matched to either McFowler or Byndum. The Converse shoes could no doubt have fit many people[7]—indeed, they appeared to fit McFowler's trial counsel. And there is nothing particularly incriminating about being barefoot or shirtless indoors. McFowler's gunshot residue test was inconclusive. The balance of the evidence, McFowler argues, merely created a link between the Flournoy apartment and the crime, which is not surprising given Byndum's confessed role in the murder.

McFowler actually goes a step further, arguing that the clothing found in the apartment was affirmatively exculpatory. One of the suspects was described as wearing a red and white jogging suit; another as wearing an orange shirt and red jogging pants.[8] A blood-stained red and white jogging suit was found in the apartment, but there was no specific indication in the transcript that the police found the orange shirt or red jogging pants, suggesting that only the first suspect was present. The problem with this argument is that there was physical evidence before the trial court that a pair of red jogging pants and a red[9] shirt were also found in the Flournoy apartment. Officer

---

[7]Without knowing the size of the Converse shoes, it is very difficult to estimate the probability that they would appear to fit a man selected purely by chance. Assuming that male foot size is normally distributed with a standard deviation around one and two-thirds United States shoe sizes, the likelihood of independently drawing two men at random from the population whose feet are within one shoe size is roughly one third (within one half of a size, roughly one sixth). With an average (mean) shoe size of 10, these distributional assumptions imply that roughly two-thirds of men have feet between sizes 8½ and 11½, roughly 95% between 7 and 13, and roughly 99% between 5 and 15.

[8]By making this argument, McFowler waives his hearsay objection to the description evidence. As will become clear below, this both hurts and helps his cause.

[9]The inconsistency between red and orange strikes this court as relatively minor.

Kulbida testified that the items of clothing found in People's Exhibit 20 were the same items which he found in the "Payless" bag in October 1989. In a motion to suppress, McFowler described the contents of the "Payless" bag as follows: one white Adidas sweat shirt, one pair of red jogging pants, one pair of red and white stripped jogging pants, one red with white and blue striped Adidas jacket, and one red Adidas T-shirt. (R. Vol. 7 of 9, at 46.) The physical exhibits apparently did not make the trip to federal court, but there is no reason to think that McFowler misstated the contents of the bag. Rather than exculpating McFowler, the clothing strongly suggests that two of the intruders fled to the Flournoy apartment. Byndum could have carried the Converse shoe himself, but it seems very unlikely that the second man would have taken off the red jogging pants anywhere but in the apartment where they were found (although if the state's theory that the Converse shoes were associated with the murder is correct, then at least one of these shoes was removed at or near the scene of the crime). Based on the clothing and the shoes,[10] a rational trier of fact could have concluded beyond a reasonable doubt that two of the intruders were in the Flournoy apartment at some point after the crime took place.

Of course, this leaves open the possibility that the second male suspect donned other clothing and left before the police arrived. Byndum, at least, appears to have had sufficient time to put on a complete set of different clothing. The next question is whether, when the evidence is, as it must be, viewed in its totality and in the light most favorable to the state, a rational trier of fact could have sufficiently discounted this possibility to conclude beyond a reasonable doubt—in other words, with

---

[10]All the shoes were reasonably well connected to the crime scene by suspicious locations (next to Byndum, in the oven, and in the Escort) and by blood (type, stain, and footprint).

It should be noted that Meredith testified that the man with the shotgun was wearing blue jeans and a white shirt. Crediting instead the descriptions of the clothing worn by the fleeing suspects is more favorable to the state.

around ninety percent likelihood, *Branion v. Gramly*, 855 F.2d 1256, 1263 n.5 (7th Cir. 1988)—that

McFowler, not some unidentified third party, was the second male intruder. For starters, the

Converse shoes appeared to fit McFowler. Two men selected at random will often be able to fit into

one another's shoes—McFowler and his lawyer, for example (*see also supra* note 7)—but McFowler

was not selected at random. Approximately thirty minutes after the crime, McFowler was the only

other adult man in the Flournoy apartment with Byndum.[11] McFowler apparently did not live at this

address—he told one police officer that he went there with a friend the night before the crime. That

McFowler was wearing only jeans is at least consistent with a recent, quick change of clothes. Not

many people sleep in jeans, so McFowler being found in bed is a little suspicious. Also, it was early

afternoon, which is an unusual time to be in bed. McFowler's fingerprints were on the same car as

Byndum's near the scene of the crime. Although a contaminated control swab made it impossible

to determine the level of barium on McFowler's hand and thus rendered McFowler's gunshot residue

test inconclusive, there were in fact elevated levels of lead and antimony, the other two heavy metals

associated with exposure to a recently discharged firearm. Contamination alone cannot account for

these elevated levels. The state's theory of the case, on the other hand, provides a simple explanation

for this and for every other piece of circumstantial evidence—*viz.*, McFowler was present at the

commission of the crime. *See United States v. Magana*, 118 F.3d 1173, 1201 (7th Cir. 1997)

("While common sense is no substitute for evidence, . . . common sense should be used to evaluate

what reasonably may be inferred from circumstantial evidence.") (citation omitted). Although it is

a close question, this court believes that a rational factfinder, viewing all of the evidence in the light

---

[11]Recall that two of the suspects seen fleeing the scene were described as black men in their twenties. McFowler fit this (albeit very rough) description.

18

most favorable to the state, could have found beyond a reasonable doubt that McFowler was present when the crime was committed.

## C. A Rational Factfinder Nonetheless Could Not Find McFowler Guilty

As noted above, however, presence at the commission of a crime, even coupled with subsequent flight, is not a sufficient basis for criminal liability in Illinois. *Shaw*, 713 N.E.2d at 1173. To be guilty of murder, McFowler must have done something more. Of course, McFowler could be guilty as a principal if he fired the fatal shot. That Logan was shot in the head suggests an intent to kill or at least the knowing creation of a strong probability of great bodily harm. 720 ILCS 5/9-1. The revolver appears to have been the murder weapon: it had four spent casings, it was found with the shotgun identified by Meredith, and Logan was apparently killed by a bullet (not a shotgun blast). Meredith saw Byndum with the shotgun shortly after Logan was shot. Since it takes two hands to fire a shotgun, the natural inference is that someone else was carrying the revolver. On the other hand, there was no evidence that the shotgun was ever fired and Byndum's hands tested positive for gunshot residue, which suggests that at some point he came in contact with the revolver. But this could have happened later—for example, when the weapons were stashed in the basement—so it seems more likely than not that someone other than Byndum was carrying the revolver at the crime scene.

Even assuming that Byndum was not carrying the revolver, a rational factfinder could not find beyond a reasonable doubt that McFowler was. Meredith's testimony and the shoe evidence strongly suggests that there were at least two intruders in the apartment. Two men and one woman were observed fleeing the scene. Meredith did not testify as to sex of the voice she heard. One

simply cannot know whether there were two or three intruders.[12] The inconclusive, rather than conclusively negative, gunshot test provides weak support for the view that McFowler handled the revolver, but he may have done so only after he fled the scene. Given the inconclusive gunshot test and the genuine possibility of a third intruder, it is impossible with the requisite degree of certitude to conclude that McFowler fired the fatal shot.

This leaves an accountability theory. Again, the critical question is whether McFowler, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, . . . solicit[ed], aid[ed], abet[ted], agree[d] or attempt[ed] to aid, [another] person in the planning or commission of the offense." 720 ILCS 5/5-2(c). Beyond carrying weapons to the Lexington apartment, there is no evidence that any of the intruders had a plan to engage in unlawful activity, much less that McFowler knew of such a plan. There is simply no direct evidence concerning what McFowler knew and did before Logan was shot. Still, Illinois case law is clear that accountability is to be determined in light of the total circumstances of the alleged crime, including subsequent events:

> While mere presence at the scene of the crime is not culpable and knowledge by the defendant that a crime was being committed does not constitute aiding or abetting, proof that the accused was present during the commission of a crime without opposing or disapproving it, that she maintained a close affiliation with her companions after the perpetration of the offense and that she failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability.

---

[12]The Illinois Appellate Court stated that "Officer Gulliford received information that *two* persons went to [the] Escort after having fled from the scene of the crime." *McFowler*, No. 1-92-2176, at 37 (emphasis added). In the third ground of his petition, McFowler claims that reliance on this hearsay evidence violated due process. Whether or not its admission amounted to a separate constitutional violation, this evidence was plainly hearsay. In its supplemental answer, the state concedes that McFowler has not defaulted this argument. Accordingly, this court accords no substantive weight to Gulliford's report of two persons fleeing the scene.

*People v. Grice*, 410 N.E.2d 209, 216 (Ill. App. Ct. 1980) (citations omitted); *accord Reid*, 554 N.E.2d at 190.

McFowler was found in the same apartment as Byndum about a half hour after the crime was committed and failed to report the crime during that time. Could a rational trier of fact conclude beyond a reasonable doubt on the basis of these two facts, coupled with McFowler's presence at the scene of the crime and flight therefrom, that McFowler, prior to or during the commission of the crime, intended to promote or facilitate it and acted to advance this goal? This court thinks not.

Accountability theory in Illinois is broad, but not this broad. The most analogous case this court has uncovered is *People v. Lopez*, 391 N.E.2d 105 (Ill. App. Ct. 1979). There, the evidence showed that identical twin brothers (the defendants) and several companions arrived together in a car, that both brothers exited the car, that one of the brothers crossed the street to shoot the victim, and that both brothers left together in the car. *Id.* at 106-07. There was no evidence as to which brother crossed the street and which remained by the car. *Id.* at 107. The state successfully argued at trial that both were criminally liable, one as a principal and the other on an accountability theory. The appellate court reversed because there was no evidence that the brother who remained in the car "had any knowledge that a crime was to be committed, or that he voluntarily attached himself to his brother and [one of the companions] with knowledge they were to commit any illegal acts." *Id.* at 108. McFowler is in essentially the same position as the brothers. That he fired the fatal shot is at best a guess. If he did not, the evidence (just as it did in *Lopez*) showed merely that he was at the

21

crime scene, that he fled with a perpetrator,[13] and that he failed to report the crime. This simply is not enough.[14]

In contrast, the Illinois Supreme Court cases that have relied on continuing affiliation with a perpetrator and failure to report the crime to affirm convictions each involved significant additional evidence of guilt. *See People v. Cooper*, 743 N.E.2d 32, 43 (Ill. 2000) ("Both defendants voluntarily attached themselves to a group bent on illegal activity when they, armed with weapons, joined fellow Gangster Disciples in rival gang territory, actively participated in shooting at Black Disciples . . . ."); *People v. Williams*, 739 N.E.2d 455, 473 (Ill. 2000) (substantial evidence of pre-planning and motive); *People v. Batchelor*, 665 N.E.2d 777, 781 (Ill. 1996) (defendant had knowledge of companion's criminal purpose "from the beginning" and acted as a lookout during commission of the crime); *People v. Taylor*, 646 N.E.2d 567, 572 (Ill. 1995) (the defendant "was aware, prior to the actual shooting, that Kendricks wanted to kill Otha Smith, that Kendricks was armed with a weapon, and that Kendricks had instructed Page where to drive to find the victim"; also, the defendant returned to the scene of the crime and gave conflicting testimony as to critical details); *Reid*, 554 N.E.2d at 191 (the defendant heard his companions discuss committing a robbery in advance and, during the commission of the crime, the defendant reached into the victim's pocket).

## III. Conclusion

In summary, it was objectively unreasonable in light of United States Supreme Court precedent for the Illinois Appellate Court to credit Meredith's identification of McFowler as the man

---

[13]Because he apparently carried the shotgun, the court assumes that Byndum could be found guilty on an accountability theory. *See supra* page 10.

[14]That McFowler was connected to the Lexington apartment by a less than overwhelming chain of purely circumstantial evidence is an additional source of doubt as to his guilt.

with the shotgun. And while the sum total of the other evidence can rationally support the conclusion that McFowler was at the scene of the crime, it cannot with the requisite degree of certainty show either that McFowler fired the fatal shot or that he intentionally facilitated commission of the crime. Because this determination is the functional equivalent of an acquittal, a retrial would violate the Double Jeopardy Clause. *Piaskowski v. Bett*, 256 F.3d 687, 694-95 (7th Cir. 2001). Accordingly, McFowler's habeas petition is granted and the state is instructed to release him from custody within 20 days of the entry of this order.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: January 2, 2003